**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **SEAN ALTON,** | ) | **CASE NO. 1:07CV3799** |
| | ) | |
| **PETITIONER,** | ) | **JUDGE JOHN ADAMS** |
| | ) | |
| v. | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **MAGGIE BEIGHTLER,** | ) | |
| **WARDEN,** | ) | |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| **RESPONDENT.** | ) | |

Petitioner, Sean Alton, ("Alton"), *pro se*, challenges the constitutionality of his conviction in the case of *State v. Sean Alton*, Cuyahoga County Common Pleas Case No. CR05-467647. He filed a Writ of Habeas Corpus (Doc. No. 1) pursuant to 28 U.S.C. § 2254 on December 13, 2007, with the United States District Court for the Northern District of Ohio. On April 25, 2008, Respondent filed her Answer/Return of Writ. (Doc. No. 8.) This matter is before the undersigned Magistrate Judge pursuant to Local Rule 72.2. For reasons set forth in detail below, it is recommended that Alton's Petition be denied.

**I. Summary of Facts**

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also House v. Bell*, 283 F.3d 37 (6th Cir. 2002). The state appellate court summarized the facts underlying Alton's conviction as follows:

[*P4]  Alton's convictions result from an incident that occurred on the night of May 24, 2005. The victim, twenty-four-year-old Michael Nottrodt, testified to the events that led to the incident.

[*P5]  Nottrodt stated he met Alton in late April, 2005 when he replied to Alton's newspaper advertisement of a room for rent in his house. Alton's house was located in Westlake. Alton owned a construction-related business. Nottrodt found the home to be a large, handsome place for which five hundred dollars a month rent seemed reasonable. He provided identification to Alton, who said he wanted to "do a criminal background check" on his potential renter.

[*P6]  Nottrodt made his living selling tickets to sporting events, which did not provide him a consistent income, and was under indictment for committing forgery. Nevertheless, Alton accepted Nottrodt's cash as rent and permitted him to move into the house on May 1.

[*P7]  Nottrodt often traveled, but when he was home, he occasionally socialized with Alton, Alton's visiting friends, and the other renter, Richard Foutz. On one of these occasions, Tuesday, May 17, 2005, Nottrodt mentioned to Alton that an acquaintance, Clinton Smith, whom Alton had met, worked at an appliance store, and told Nottrodt he could sell plasma televisions at a good price. Alton expressed interest, so Nottrodt accompanied Alton to the store. Alton gave Smith $ 2850 and received what appeared to be a store receipt for two plasma television sets. Smith promised the sets would be delivered on Thursday morning.

[*P8]  When no delivery occurred on the appointed morning, Alton asked Nottrodt to contact Smith. Smith indicated the delivery would be delayed until evening. However, that night, again, no delivery came.

[*P9]  This time, when Nottrodt attempted to contact Smith, he was unsuccessful. The following morning, Friday, Nottrodt discovered the appliance store did not employ Smith. Alton became "agitated." He informed Nottrodt that he needed the $ 2850 to pay his workers on Saturday, and that, since he had made the deal with Smith through Nottrodt, he held Nottrodt responsible for the money. Alton "told [Nottrodt] to do whatever [he] needed to do to obtain $ 2850 immediately." Since Nottrodt was living in Alton's house, he did not feel in a position to argue.

[*P10]  Nottrodt believed one of his ticket buyers would deposit money into Nottrodt's bank account that would be sufficient to cover the sum. Alton therefore agreed to take him to the bank to obtain the funds. When they arrived, Nottrodt found the customer's check had not yet cleared.

[*P11]  The next morning, Saturday, Nottrodt awakened to a "red laser light beaming" into his eyes. Since he was aware Alton had permits to keep several guns in the house; he believed the light came from a gunsight. At that time, Alton "threatened to kill [Nottrodt] if [he] did not come back with any money" that day. Nottrodt got dressed, and Alton drove him to the bank. Alton "carried his firearm with him."

[*P12]  Once again, Nottrodt discovered the check had not cleared. When he informed Alton, Alton began "flipping out," and "demanded that [Nottrodt] stay with him [for] the rest of the day." Nottrodt thus was with Alton when Alton asked for and received a loan from another man, "Patrick," to pay his

employees. Alton informed Nottrodt that he now owed over $ 5000.

[**5] After they returned to the house, Nottrodt received a $ 500 payment from a customer for some tickets. He handed the money to Alton, who, as he took it, advised Nottrodt pay the rest by "Monday or Tuesday at the latest."

[*P14]  On Monday, Alton called Nottrodt many times to threaten him. Nottrodt assured Alton he would obtain the money from the bank that day. However, Nottrodt later discovered that his customer's check was returned for insufficient funds. Nottrodt decided to stop answering his cellular telephone.

[*P15]  On Tuesday afternoon, May 24, 2005, Nottrodt's mother told him Alton stopped at her home, asking Nottrodt to call. Nottrodt decided to do so. Alton at that point seemed calm; he told Nottrodt they should "sit down like men and discuss if [he] need[ed] to make payments" on the debt. He requested Nottrodt to meet him at a men's club in Cleveland. Nottrodt agreed.

[*P16]  Shortly after the conversation, Alton's girlfriend Kim Thomascik called Nottrodt. She stated she was nearby, asked Nottrodt to drive over to pick her up, and indicated together they would go to the meeting with Alton.

[*P17]  When Nottrodt and Thomascik arrived in the parking lot of the men's club, Nottrodt stopped his car near Alton's truck. Nottrodt exited his car to find Alton pointing a gun at him. Alton stated, "Get on the ground mother fucker before I kill you."

[*P18]  Nottrodt complied; as he lay on the pavement, Alton grabbed his hands, pulled them behind his back, and placed handcuffs on him. Alton then "picked [him] up***and threw [him] in" the rear seat of Alton's truck, tearing Nottrodt's shirt in that process. Alton climbed in next to him. Upon searching Nottrodt's pockets, Alton found $ 1204, the money Nottrodt had earned selling tickets that day. Alton appropriated $ 1200, replaced $ 4, and, holding the gun to Nottrodt's head, ordered Thomascik to drive around.

[*P19]  During the ride, Alton stated that for "screwing [him] over" by facilitating the transaction with Smith, he wanted Nottrodt to know "right now [he] could kill [Nottrodt] and nobody would know***." Alton suggested Nottrodt could obtain money from his mother. Nottrodt protested. At that point, Alton set his gun on the floor, and extracted a "taser gun" from the pocket behind the driver's seat. He placed the taser against Nottrodt's leg and activated it.

[*P20]  The pain of the shock caused Nottrodt to scream. According to his testimony, Alton activated the taser at least ten times during the ride. At one point, Alton told Thomascik to call Richard Foutz, the other housemate. When she made the call, she passed the telephone to Alton, who told Foutz that he had Nottrodt, and could collect the money Nottrodt owed Foutz on a lost bet. He activated the taser against Nottrodt so that Foutz could "hear him scream."

[*P21]  When Nottrodt eventually agreed to obtain the money from his parents, Alton ordered Thomascik to return to Nottrodt's car. The two of them left Nottrodt there with "four dollars [and] pretty close to [an] empty gas tank."

[*P22]  Nottrodt drove to his mother's home, informed her of what had occurred, showed her the burn marks left by the taser on his skin, and indicated he would

> need money. The following morning, each of Nottrodt's parents provided him with a certified check in the amount of $ 2500. Nottrodt took the checks to Alton's house. Alton accepted them and indicated he was satisfied. Nottrodt then took his parents' advice and proceeded to the Westlake police department.
>
> [*P23] After listening to Nottrodt's story and observing the marks on his leg, police officer Charles Escalante, who was assigned to the detective bureau and held the position of "Executive Assistant" to the Chief of Police, made an application for a search warrant for Alton's house. He obtained a judge's signature and executed the warrant on the morning of May 25, 2005. During the search, police officers found, *inter alia*, the gun, handcuffs and taser unit Nottrodt described in his account of the incident.

(Resp. Exh. 8.)

## II. Procedural History

### A. Conviction

On June 29, 2005, a Cuyahoga County Grand Jury charged Alton with two counts of aggravated robbery, two counts of felonious assault, one count of kidnapping, one count of extortion and one count of possession of criminal tools, along with six firearm specifications. (Resp. Exh. 1.)

On March 20, 2006, Alton filed a motion to suppress evidence claiming that the affiant of the search warrant, Charles Escalante, was not a peace officer within the jurisdiction of the court and thus the warrant was issued in violation of state law. (Resp. Exhs. 2 and 3.) After a hearing, the court denied the motion. (Resp. Exh. 4, Tr., Vol. 1, pp. 5-31.)

On April 3, 2006, a jury found Alton guilty of one count of aggravated robbery, extortion, kidnapping, and felonious assault, all including firearm specifications, along with one count of possession of criminal tools. On April 20, 2006, the trial court sentenced Alton to an aggregate term of eight years incarceration. (Resp. Exh. 5.)

### B. Direct Appeal

Alton, through new counsel, filed a timely Notice of Appeal with the Court of Appeals for the Eighth Appellate District ("state appellate court") presenting four assignments of error, two of which are at issue in the instant Petition:

> 1. The trial court erred in denying appellant's motion to suppress evidence where the affiant officer was not a legally and duly sworn police officer for the law enforcement agency which effected the search of appellant's home.

* * *

> 4. The trial court erred in excluding character evidence offered by appellant, in violation of appellant's constitutional right to a fair trial.

(Resp. Exh. 6.)

On May 3, 2007, the state appellate court affirmed Alton's conviction. (Resp. Exh. 8.)

Alton, through his appellate counsel, filed a timely appeal to the Ohio Supreme Court presenting two propositions of law:

> 1. A search warrant is invalid where the affiant officer was not a legally and duly sworn police officer for the law enforcement agency which effected the search.
>
> 2. Exclusion of character evidence offered by appellant is reversible error in violation of evidence rule 404(a), and in violation of appellant's constitutional right to a fair trial.

(Resp. Exh. 9.)

On October 24, 2007, the Ohio Supreme Court denied Alton leave to appeal. (Resp. Exh. 11.)

### C. Federal Habeas Petition

On December 13, 2007, Alton, *pro se*, filed a Petition for Writ of Habeas Corpus and asserted the following grounds for relief:

> Ground One: Petitioner's Constitutional Right to Due Process and a Fair Trial were violated where the affient [sic] to the search warrent [sic] was not a legally and duly sworn Police Officer for the law enforcement agency which effected the search.
>
> Supporting Facts: Charles Escalante was the person in charge of the investigation of petitioner which led to the criminal charges against petitioner. Escalante was not a legally sworn police office for the city of Westlake, the investigating and arresting agency. As a result, Escalante had no authority to apply for a search warrant and execute a search of Petitioner's home.
>
> Ground Two: Petitioner's right to a fair trial and due process of law was violated where character evidence was excluded by the trial court.
>
> Supporting Facts: Petitioner sought to offer witness evidence of his good non-aggressive character. He also attempted to offer evidence that he was a responsible gun owner. The trial court refused to admit this witness evidence.

(Doc. No. 1.)

### III. Review on the Merits

5

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997). The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010, *quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of

6

federal law. *Id.* at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006), *citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998).

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also House v. Bell*, 283 F.3d 37 (6th Cir. 2002).

### IV. Analysis

#### A. Ground One

In Ground One, Alton alleges that the search warrant was invalid because the affiant was not qualified under state law. As a result, Alton maintains that his constitutional rights to due process and a fair trial were violated when evidence seized pursuant to the warrant was considered by the jury.

Respondent contends that Ground One is noncognizable for two reasons. First, it involved an alleged invalid seizure of evidence ruled upon by the state court after a suppression hearing was held. Secondly, she argues that Alton is asserting an error in the state court involving purely state law.

Generally, a writ of habeas corpus is not available on the ground that a petitioner's Fourth Amendment rights were violated if the petitioner had an opportunity to present the Fourth Amendment claim in state courts. *See Stone v. Powell*, 428 U.S. 465, 494 (1976); *Wallace v. Kato*, 127 S. Ct. 1091, 1099 n. 5 (2007); *accord Ewing v. Ludwick*, 134 Fed. Appx. 907, 911 (6th Cir. 2005). The United States Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone*, 428 U.S. at 494. The Sixth Circuit has found that the determination as to whether a petitioner has had an opportunity for full and fair hearing of a Fourth Amendment claim requires a federal district court to make two separate inquiries. *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982) (citations omitted). First, the district court should ascertain "whether the state procedural

7

mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim." *Id*. Second, the district court must ascertain "whether presentation of the claim was in fact frustrated because of a failure of that mechanism." *Id*.

Because the Sixth Circuit already has determined that "[t]he mechanism provided by the State of Ohio for the resolution of fourth amendment claims is . . . clearly adequate," this Court's role is confined to the second inquiry – namely whether presentation of the claim was in fact frustrated because of a failure of that mechanism. *Id*.; *accord Bridges v. Bradshaw*, 2006 U.S. Dist. LEXIS 96749 (N.D. Ohio 2006).

In this case, the record reflects that Alton presented his Fourth Amendment claim to the Ohio courts; and, that it was carefully considered and rejected at the trial level after a suppression hearing and later on appeal. The state appellate court concluded that as a matter of state law the affiant was qualified to seek the warrant.

> {¶ 23} After listening to Nottrodt's story and observing the marks on his leg, police officer Charles Escalante, who was assigned to the detective bureau and held the position of "Executive Assistant" to the Chief of Police, made an application for a search warrant for Alton's house. He obtained a judge's signature and executed the warrant on the morning of May 25, 2005. During the search, police officers found, *inter alia*, the gun, handcuffs and taser unit Nottrodt described in his account of the incident.
>
> \* \* \*
>
> [\*P31] In his first assignment of error, Alton argues that the search warrant pursuant to which the police discovered his guns, the handcuffs, and the taser unit that Nottrodt identified as the ones Alton used during the incident was invalid.
>
> [\*P32] He contends that evidence should have [\*\*10] been suppressed on the ground that Escalante was not a "law enforcement officer" as defined in R.C. 109.71-77 and R.C. Chapter 124. Alton thus claims that, since Escalante was appointed to his position without taking a civil service examination, he was not qualified to seek a search warrant. This claim ignores the testimony provided to the trial court at the hearing on Alton's motion to suppress evidence. [footnote 1]
>
> FOOTNOTE[ ]
>
>> 1 Even if this court were to find Alton's claim supported in the record, the decision in *United States v. Freeman* (8th Cir. 1990), 897 F.2d 346 would render his argument unpersuasive. Using the analysis set forth in *Freeman*, a violation of the state "procedural requirements" which govern the application for a search warrant generally would not trigger the exclusionary rule unless: 1) the search either might not have occurred or would

8

> not have been so abrasive if the requirements had been followed, or 2) there is evidence of an intentional disregard of the requirements. The testimony adduced at the hearing established neither of those exceptions. *See also, United States v. Luk* (9th Cir. 1987), 859 F.2d 667.
>
> [*P33]  Westlake's chief of police testified that Escalante "started as a part-time patrol officer assigned to the detective bureau" in 1999, that Escalante was "a sworn police officer" with "current certifications as an Ohio peace officer," and had attended training in order "to maintain that status." The chief testified that as his executive assistant, Escalante continued to work in the detective bureau "in charge of vice and narcotics" investigations. The chief considered Escalante his department's "expert on preparing affidavits in support of criminal***seizure warrants."
>
> * * *
>
> [*P35]  For the foregoing reason, Alton's first assignment of error is overruled.[1]

(Resp. Exh. 8.)  Alton may be disappointed with his inability to persuade the Ohio courts that the search warrant was prepared and executed in violation of Ohio law, but the record clearly shows that he received all the process he was due.

Even if Officer Escalante was not technically qualified to seek a search warrant under Ohio law, the exclusion of the evidence would not be constitutionally required.  Several federal courts have considered whether a violation of the procedural requirements governing the application, issuance and execution of search warrants triggers the exclusionary rule.  *See United States v. Freeman*, 897 F.2d 346, 348 (8th Cir. 1990); *United States v. Luk,* 859 F.2d 667 (9th Cir. 1988); *United States v. Burke*, 517 F.2d 377 (2d Cir. 1975).

In *United States v. Luk*, 859 F.2d 667 (9th Cir. 1988), the Ninth Circuit faced the same issue as in the present case:  whether the application for a warrant by an unauthorized person invalidates the search warrant thereby triggering application of the exclusionary rule.  In *Luk*, the investigator was an administrative officer of the United States but was not authorized to apply for a search warrant.  Nevertheless, he applied for a warrant to a federal magistrate.

---

[1] A dissenting judge held that the search warrant was invalid as Officer Escalante was not a law enforcement officer within the meaning of Crim.R. 41 and O.R.C. § 2901.01(11) since his position was created by two Westlake ordinances. *See* dissenting opinion, ¶¶ 86-94.

The *Luk* Court determined the exclusionary rule should not be applied to a warrant improperly issued to and executed by an officer lacking authority under Rule 41. The Court examined the issue using a fundamental/nonfundamental approach:

> Only a "fundamental" violation of Rule 41 requires automatic suppression, and a violation is "fundamental" only where it, in effect, renders the search unconstitutional under traditional fourth amendment standards. Violations of Rule 41 which do not arise to constitutional error are classified as "non-fundamental." "Non-fundamental" noncompliance with Rule 41 requires suppression only where:
> (1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or
> (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.

*Id.* at 671 (*quoting United States v. Vasser*, 648 F.2d 507, 510 (9th Cir. 1980)), *cert. denied*, 450 U.S. 928 (1981). The *Luk* Court applied this analysis to reach its decision:

> [T]he nonfundamental Rule 41 violation in question is not equivalent to a fundamental violation because it neither prejudiced Luk nor resulted from deliberate disregard or bad faith on the part of [the government agent] or [the Assistant United States Attorney.] The Rule 41 violation here did not prejudice Luk; the violation did not itself result in . . . "an unconstitutional warrantless search."

*Luk*, 859 F.2d 673-74.

In *United States v. Freeman*, 897 F.2d at 348-49, the Eighth Circuit applied the approach used in *Luk* and concluded that no constitutional violation occurred. The *Freeman* Court found that the agent was unauthorized to apply for and execute a search warrant, but nonetheless carried out the application and execution in good faith believing that he possessed the authority to do so. *Id.* The search warrant at issue was otherwise constitutional – there was probable cause to search and the warrant described "with particularity the place to be searched and the items to be seized." *Id.* The Court also considered that the defendant "suffered no prejudice in the sense that the search might not have occurred or been so abrasive had the procedural requirements been followed." *Id.*

Other circuits have adopted this general refusal to apply the exclusionary rule to violations of Rule 41, absent a constitutional infirmity or showing of prejudice or reckless disregard. *See United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983); *United States v. Stefanson*, 648 F.2d 1231, 1235 (9th Cir. 1981); *United States v. Pennington*, 635 F.2d 1387,

10

1390 (10th Cir. 1980), *cert. denied*, 451 U.S. 938 (1981); *United States v. Mendel*, 578 F.2d 668, 673 (7th Cir. 1978), cert. denied, 439 U.S. 964 (1978).

In the case at bar, Ohio Crim R. 41(A) and Ohio Rev. Code § 2901.01(A) set forth the rules governing search warrants in Ohio.[2]  Officer Escalante, as well as his supervisor, believed he was authorized to apply for and execute the search warrant.  The state appellate court considered the testimony offered at the suppression hearing by the Westlake Chief of Police that Escalante was "a sworn police officer" with "current certifications as an Ohio peace officer," and had attended training in order "to maintain that status."  The Chief testified that Escalante, as his executive assistant, worked in the Westlake detective bureau "in charge of vice and narcotics" investigations.  The Chief considered Escalante his department's "expert on preparing affidavits in support of criminal * * * seizure warrants." (Resp. Exh. 8, ¶ 33.)

The state appellate court upholding the warrant and refusing to suppress the evidence gathered thereunder was not an unreasonable application of clearly established federal law.

The Court need not consider Respondent's second argument that ground one is noncognizable because it involves purely state law.  The U.S. Supreme Court has stated many times that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Pulley v. Harris*, 465 U.S. 37, 41 (1984).  Errors in the application of state law, especially rulings regarding the admission or exclusion of evidence,

---

[2]Pursuant to Ohio Crim R. 41(A), a search warrant may be issued by a judge upon the request of a prosecuting attorney or a law enforcement officer.  Ohio Rev. Code § 2901.01(A) defines a law enforcement officer as follows: "Law enforcement officer" means any of the following:

(a) . . . police officer of a township . . ., municipal police officer . . . .;
(b) An officer, agent, or employee of the state or any of its agencies, instrumentalities, or political subdivisions, upon whom, by statute, a duty to conserve the peace or to enforce all or certain laws is imposed and the authority to arrest violators is conferred, within the limits of that statutory duty and authority; * * *

11

are usually not to be questioned in a federal habeas corpus proceeding. *Coleman v. Mitchell*, 244 F.3d 533, 542-543 (6th Cir.2001); *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988).

Ground One is without merit.

### B. Ground Two

In the second ground, Alton alleges that his due process rights were violated when the trial court prevented him from offering evidence of his nonaggressive character. Again, Respondent asserts that Ground Two is noncognizable as it concerns an evidentiary issue on which the state court ruled.

At most, Alton advances an error of state law, which cannot give rise to habeas relief. *See Buell v. Mitchell*, 274 F.3d 337, 357 (6th Cir. 2001) (finding that "habeas review does not ordinarily extend to state court rulings on the admissibility of evidence").

Nonetheless, even after reviewing this claim on the merits, Alton has not demonstrated a due process violation.

The right to present a complete and meaningful defense emerges from the Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment. *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000), *rehg. and sugg. for rehg. en banc den*. (2000) (*citing Crane v. Kentucky*, 476 U.S. 683, 690 (1986)); *California v. Trombetta*, 467 U.S. 479, 485 (1984). When a trial court decision has excluded evidence in a way that denies a defendant a fair trial, the Supreme Court has found a violation of that defendant's right to present a defense. *See Crane*, 476 U.S. at 690 (finding that the trial court violated Crane's right to present a defense when it excluded evidence bearing on the credibility of his confession); *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (invalidating a state's hearsay rule because it violated a defendant's right to present witnesses in his own defense). "At the same time, finding that state and federal rulemakers have 'broad latitude' under the Constitution to establish rules excluding evidence from criminal trials, *United States v. Scheffer*, 523 U.S. 303, 308 (1998), the Supreme Court has tread carefully when assessing whether the exclusion of certain evidence amounts to a constitutional violation." Rules excluding evidence "do not abridge an accused's right to present a defense

12

so long as they are not 'arbitrary' or 'disproportionate to the purpose they are designed to serve.'" *Id. (quoting Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). The exclusion of evidence is arbitrary or disproportionate "only where it has infringed upon a weighty interest of the accused." *Id.; see Wong v. Money*, 142 F.3d 313, 325 (6th Cir. 1998).

The state appellate court discussed whether Alton was denied a constitutional right when he was not allowed to offer evidence supporting his good character:

> {¶ 44} Alton argues in his fourth assignment of error that the trial court's decision to prevent him from offering evidence of his nonaggressive character compromised his right to a fair trial. This argument is unpersuasive in light of the record.
>
> {¶ 45} Evid.R. 404(A)(1) permits the accused in a criminal prosecution to offer appropriate evidence supporting his good character in order to establish that he acted in conformity with that good character on the particular occasion of the crime charged, and therefore did not commit the crime. *State v. Nobles* (1995), 106 Ohio App.3d 246. Nevertheless, the exclusion of such evidence does not always constitute reversible error; instead, it may be harmless error. In the matter of *Definbaugh*, Tuscarawas App. No.2003AP03-0021, 2003-Ohio-6138.
>
> {¶ 46} The record in this case demonstrates that the evidence which the trial court prevented Alton from introducing during his case-in-chief already had been elicited on cross-examination of two of the state's witnesses. Thomascik testified Alton had licenses to own his guns, she had never before seen him use them improperly, and she thought of him as a successful businessman. Similarly, Foutz stated that in his experience living in Alton's house, he believed Alton to be a reliable person and a responsible gun owner whom he had never seen to be violent or hurtful to anyone.
>
> {¶ 47} Under these circumstances, the jury was cognizant of Alton's general character. In light of the overwhelming evidence of his guilt of the offenses in this case, therefore, the trial court's refusal to permit additional character evidence must be deemed harmless error. *Id.*; *State v. Williams* (1983), 6 Ohio St.3d 281, paragraph six of the syllabus.

(Resp. Exh. 8.)

The state appellate court found that the trial record demonstrated that the evidence Alton was looking to introduce during his case-in-chief had already been elicited on cross-examination of two of the state's witnesses. "Thomascik testified Alton had licenses to own his guns, she had never before seen him use them improperly, and she thought of him as a successful businessman." *Id*. at ¶ 46. The other witness stated "he believed Alton to be a reliable person and a responsible gun owner whom he had never seen to be violent or hurtful

13

to anyone." *Id*. The state appellate court determined that the jury was aware of Alton's general character, and in light of the overwhelming evidence of his guilt, the trial court's refusal to allow additional character evidence was harmless error.

In *Fry v. Pliler*, -- U.S. --, 127 S.Ct. 2321, 2328 (2007), the Supreme Court held that a federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the . . . standard set forth in *Brecht* [*v. Abrahamson*, 508 U.S. 619, 113 S.Ct. 1710, 123 L.Ed. 2d 353 (1993)]." *Fry*, 127 S.Ct. at 2328. The standard is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 623 (citation omitted). "If, however, 'the matter is so evenly balanced' that the habeas court has 'grave doubt' as to the harmlessness of the error, it should 'treat the error, not as if it were harmless, but as it if affected the verdict." *Hereford v. Warren*, 536 F.3d 523, 533 (6th Cir. 2008) (*citing O'Neal v. McAninch*, 513 U.S. 432 (1995)).

The trial court's refusal to allow Alton's witnesses to testify as to his good character did not have a substantial and injurious effect or influence in the outcome of the trial. Upon considering the evidence, including the favorable testimony about Alton elicited on cross-examination of the state's witnesses, the decision was not contrary to clearly established United States Supreme Court precedent. Ground two is without merit.

### V. Evidentiary Hearing

Alton requests an evidentiary hearing in order to establish any unanswered material issues of fact. Generally, a habeas petitioner is entitled to an evidentiary hearing in federal court if the petition "alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing." *Stanford v. Parker*, 266 F.3d 442, 459-460 (6th Cir. 2001) (*citing Wilson v. Kemna*, 12 F.3d 145, 146 (8th Cir. 1994) (citation and internal quotation omitted)). However, a petition may be summarily dismissed if the record clearly indicates that the petitioner's claims are either barred from review or without merit. *Id.*

In this case, upon review of the pleadings and transcripts, the procedural issues presented can be resolved from the record. An evidentiary hearing is, therefore, not required.

14

## VI.  Conclusion

For the foregoing reasons, the Magistrate Judge recommends that Alton's Petition be denied.

s/Greg White
U.S. MAGISTRATE JUDGE

Date:  December 15, 2008

**OBJECTIONS**
**Any objection to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See** *United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**